[*General Term,* April, 1872.]

### STEPHEN W. WILKINS *v.* THE TOBACCO FIRE AND MARINE INSURANCE COMPANY.

Where a *time* policy of insurance upon a steamboat, insuring her against the perils of navigation and loss by fire, contained these provisions: "With permission to navigate the Ohio and Mississippi rivers below Cairo, Illinois—coal oil clause waived," followed by a clause among the special warranties containing the coal oil clause, stipulating as follows: "Warranted by the assured . . . . that the said vessel shall be run and navigated upon the aforesaid privileged waters, as is usual for boats of her class, in the usual prosecution of business," and also containing other stipulations as to what things should but temporarily suspend the risk, deviation from the area of permitted waters not being among those mentioned; and where such insured boat, during the time covered by the policy, without the consent of the underwriter, made a voyage in safety upon another river than those specified as permitted, and was afterward, during the period of insurance, destroyed by fire, within the permitted waters:

*Held*, that the policy amounted to a *warranty* that the boat should navigate none other than the permitted rivers, as well as that she would navigate them in the usual way for boats of her class, and in the usual prosecution of business; that such warranty was broken by the unauthorized voyage on another river than those permitted, and that the insured can not recover for the boat's subsequent loss by fire.

Where, in the same case between the same parties, a question has been decided by this court, in General Term, and the cause is again brought before the court for determination, other questions being involved, the first decision will not be reviewed, but the parties left to seek their remedy in the Supreme Court, unless application has been regularly made and granted for a rehearing of the first decision, or unless the court shall request a re-argument of the matters formerly passed upon.

*Lincoln, Smith, Warnock & Stephens,* for plaintiff.

*Hoadly & Johnson,* for defendant.

YAPLE, J.    On July 3, 1867, the defendant in error insured the steamboat St. Patrick, "wherever she then was in safety," for one year, in the sum of three thousand dol-

lars—the rate of premium paid being thirteen per cent. or three hundred and ninety dollars—against the perils of navigation, etc., and against loss by fire. In relation to the boat's field of navigation, during the period covered by the insurance, the policy contains these words:

"With permission to navigate the Ohio and Mississippi rivers below Cairo, Illinois. Coal oil clause waived." All this is in writing except the words "with permission to navigate." And the policy also contained this printed clause, grouped with the coal oil clause, and other warranties: "Warranted by the assured  .  .  .  .  .  that said vessel shall be run and navigated upon the aforesaid privileged waters, as is usual for boats of her class, in the usual prosecution of business; and this policy shall be null and void while said vessel shall be unseaworthy, or condemned as unseaworthy, except while proceeding to a port for repairs, and during the time for such repairs." No express permission is given to go beyond the privileged waters (except for repairs), with a stipulation that the policy shall be void or suspended only during the time of such going beyond bounds. After the policy had attached, that is, after the insurance had been fully effected, and during the time covered by it, the insured boat, the St. Patrick, made a trip, or voyage, under the command of her regular captain, J. B. Archer, up White river and beyond the expressly permitted waters, in place of one of the regular White river packets, the "Commercial," then laid up for repairs. This voyage was made with the full knowledge and concurrence of the owner of the St. Patrick, the assured; but it was made in safety and without any injury to the vessel insured, which duly returned to Memphis, Tennessee, within the permitted waters. It was the last trip the boat made. In about a week thereafter, April 18, 1868, it was totally destroyed by fire while "lying up," near Memphis. Wilkins, the present owner of the policy of insurance, by assignment from Mr. Pyne, the owner of the boat, and the party originally insured, having been refused payment for the loss by the

defendant, brought this suit, which was tried in this court at Special Term, on submission to the court, where a finding was made against him and in favor of the insurance company as to his claim for loss by fire, and a judgment was rendered in his favor only for the amount of a small loss occurring previous to the trip up White river. He moved for a new trial; his motion was overruled, to which he excepted; took a proper bill of exceptions, embodying all the evidence, and he now brings the case here upon petition in error. The case was once previously tried at Special Term by a jury, which, under the instructions of the court, upon the evidence, found for the defendant, on the ground that the policy had been rescinded and canceled, by agreement of the parties, or their agents, before the burning of the boat. The plaintiff moved for a new trial, and his motion was reserved for decision in General Term. This court, in General Term (see 1 Superior Court Reporter, 349), granted him a new trial—a majority of the court holding that the evidence was insufficient to warrant a finding of rescission, or cancellation of the policy. The same evidence is now before us upon the record.

The first question raised by counsel for the defendant is one of practice. It is urged upon us that the evidence does prove the cancellation of the risk before the burning of the boat, and that we should now so hold, notwithstanding the former decision of this court in General Term. That decision was made in this very case between the same parties that are now before us. It simply granted a motion, which it was in the discretion of the court to grant, and thereby the verdict was set aside, and the case stood as if no jury had ever passed upon the facts. The whole case was retried to the court. As all the parties' rights would be fully saved, in any event, and that business may be properly dispatched, that every step taken in a case may be so much progress, we decline to review such former decision. We can not properly sit as a court of errors upon our own decisions as a court of errors. That decision must

stand for the purposes of this case in this court, as no application was ever made for a rehearing, nor any request for reargument expressed by the court. In another case, the same question would properly come before us for determination anew, if involved in it. The principal question which this case presents for decision, is, whether the words, " with permission to navigate the Ohio and Mississippi rivers below Cairo, Illinois," construed with all the other terms of the policy bearing upon the question, withheld from the insured boat the privilege of navigating other waters than the Mississippi river and the Ohio river, below Cairo, Illinois, during the time covered by the policy of insurance? Whether the policy contains *a warranty* that the boat should not be employed during the year in the navigation of any other waters?

It is doubtless true, that by the terms of this policy, the boat, if, when it was insured, was safely in the Missouri river, might have gone to the permitted waters and would have been covered by the policy during its transit; for, the end being given, the means to that end were also given. By the terms of this policy, it also had the privilege to go to a port in other waters for necessary repairs, without being withdrawn from the protection of the policy. ·

It is also a settled rule, that where the attaching of a risk at all depends upon the performance of a condition precedent by the assured, a literal compliance with such condition will be sufficient, a substantial compliance not being required. Thus in *Hide* v. *Bruce*, 3 Doug. 213, a ship was warranted to have twenty guns. She had that number of guns, which it required sixty men to man. She had but twenty-five men. Lord Mansfield held that there was a compliance with the warranty. See also *Thwing* v. *Great Western Ins. Co.*, 103 Mass. 401; *Forbush* v. *Western Mass. Ins. Co.*, 4 Gray, 337; and from *De Hahn* v. *Hartley*, 1 T. R. 343; 2 T. R. 186, it equally appears that a warranty, which is a condition precedent, must be literally complied with before the risk can attach. The ship was warranted to sail from Liverpool

with fourteen six-pounders, swivels, small arms, and fifty hands, or upward. She had only forty-six men on board when she sailed from Liverpool, but took six more on at Anglesea, only six hours afterward. The loss was in no way owing to the deficiency. Lord Mansfield held, in this case, that there never was any contract; the warranty not being complied with when the vessel sailed on her voyage, the risk did not attach. It is also clear that, after the contract of insurance becomes operative, and it is sought to avoid it on the ground of a breach of some subsequent warranty, such breach must be a substantial breach, and clearly proven. But compliance with a warranty in this class of cases is always a condition precedent to a right of recovery upon the policy. It is, too, a rule of law, that words, claimed to amount to a warranty, being used for the protection and benefit of the insurer, and their language framed by him, are to be construed most strictly against him, and if, upon them, construed with the aid of the entire instrument, there is a fair doubt as to whether they constitute a warranty or not, such doubt is to be resolved in favor of the party insured by the policy and against the underwriter. The words are, in such case, not to be construed as amounting to a warranty. Hopkins' Manual of Marine Ins. 177.

It is also a sound rule for construing policies of insurance (the greater portions of their contents being printed, and the attention of the parties never so specially directed to them) to give more consideration to their *written* clauses or terms, or to such of the printed parts as the written show to have been called to the minds of the parties. This is especially true of marine policies, which are even yet tinged with some of the colors of expression peculiar to the first ones. The form was substantially introduced into England some six centuries ago by the Lombards. " It is extremely inaccurate and unskillfully framed," says Marshall in his work on Marine Insurance. " It has always been considered in courts of law as an absurd and incoherent instru-

ment," says Justice Buller. But its words are altered with great caution for fear of changing legal decisions, which have settled the meaning of nearly every sentence of it. This is a caution our underwriters might safely imitate; for frequent changes in the form of these instruments destroy all certainty of rights under them, and tend to introduce legal distinctions of so much nicety that none but thorough lawyers, after the most careful analysis, can understand them, if they do not necessarily occasion conflicting decisions upon points that should be so well settled as not to admit of question. The English try to retain their form, and attach to the policy a paper of special conditions applicable to the particular risks. It is certainly true, too, that, in many important respects, what are termed " voyage" and " time " marine risks differ. But where a time policy limits the navigation of a vessel to a specified area of waters, navigation beyond that area is similar to deviating from a prescribed voyage. Both recognize the fact that different perils arise in different places. And we do not think that the denial of the right of recovery, to a party insured, on his policy, where he has broken one or more of his warranties contained therein, is to be considered as the enforcement of a *forfeiture* against him. It is more nearly the case of a party who is denied the right to recover upon a contract which he himself has violated, and which he is bound fully to perform—a very familiar rule, and one applied in all classes of contracts. Not everything contained in a policy of insurance is to be construed as a warranty—especially is this so in relation to matters in their nature collateral; to make these warranties it must be expressly stipulated that they are such. But where a warranty is contained in a policy of insurance, it can not be avoided because of its want of materiality, nor can it be broken by the insured, though no loss result from the breach. 1 Pars. Mar. Ins. 337.

But what is a warranty? "A warranty is a written description, or declaration, *embodied in the policy itself*, affirm-

ing a particular state of things, or undertaking that certain things *shall be done,* or excepted." Hopkins' Man. Mar. Ins. 195.

"Warranties are stipulations or promises of the assured, *in the policy,* that certain things exist, or *shall exist,* or have been, or *shall be done.*" 1 Pars. Mar. Ins. 337.

Representations are not carried into the policy; they exist outside of it, and must be material.

"In the policy of insurance, especially, all words which *define the risk,* name places, or limit time, are of the highest importance; they are *really warranties,* and must be absolutely and strictly complied with." Hop. Man. Mar. Ins. 181, 182.

Thus, in *Sawyer* v. *Coasters' Mutual Ins. Co.,* 6 Gray, 221, the policy contained this clause: "Said vessel not allowed to carry grain in bulk *across* the Atlantic." The vessel was insured on the 21st of September, 1847, for one year. She had sailed for a port in Ireland carrying grain in bulk, on the 24th of August preceding her insurance. She was destroyed three days after being so insured, while entering the harbor at her destined port. The court held she was carrying grain in bulk "*across*" the Atlantic at the time of her loss, though it was urged that the warranty was to be construed *literally,* that when the insurance was effected, the ship was entering the harbor, and did not *afterward* "cross" the Atlantic with grain in bulk.

"Any explicit allegation or assertion of a fact may be sufficient as a warranty thereof." 1 Pars. Mar. Ins. 339.

So, to constitute a warranty, the use of the word "warrant" is no more necessary in a policy of insurance than in other written contracts.

If, then, in this case, it be clear, from the entire instrument, that during the time the St. Patrick remained insured by the defendant, the insured warranted that the boat's area of navigation should be limited to the waters of the Mississippi and Ohio rivers below Cairo, Illinois, it is admitted that such warranty was broken by the boat's trip

up White river, and that the defendant is discharged from liability for the loss happening afterward by fire, though such voyage in no manner occasioned the boat to encounter the particular peril.

The breach of a warranty "is fatal, not only to the potency of a contract, but to its very existence; and this even when in result the failure of a warranty complained of could be shown not to have affected, in any way, the safety of the property, or to have increased the quantum of risk." Hop. Man. Mar. Ins. 195.

But, says the same author, page 176: "We must be guarded, however, in deciding that a subsequent loss was altogether unaffected by a breach of warranty, though between the breach and the loss there have been a long train of circumstances—a chain work of causes and effects. It may well be that something depended on the first link, the *sine qua non* of all the succeeding events. Ten tons of cargo more than the warranted quantity may have been the efficient cause of a ship taking the bar, which she would have cleared but for the last inch or two, or displacement," etc.

In this case, if one trip up the White river was no breach of any warranty contained in the policy, fifty would not have been, but would only have had the effect of leaving the boat uncovered by this policy during such voyages. Yet they might have been the cause of bringing the boat and some peril sufficient to destroy her, together at the same time in the permitted waters. One day's difference in leaving a wharf by a boat may be the means of saving her from a fire that is to break out in the boat by whose side she has been lying for days. Her having taken a given trip might have kept her at the wharf longer to her unforeseen but inevitable destruction.

It is contended, however (and this is the question to be decided in the case), by the counsel for the plaintiff, in a a very able argument, that the legal effect of the risk is this: This boat was at full liberty, under the terms of the policy, to navigate any waters she chose during the year, the

insurance company to be liable for losses insured against only within the permitted waters; that there is no warranty against navigating other waters than those named in the policy.

The defendant's counsel claim that there is a warranty that the boat, during the year, should navigate none other than the permitted waters mentioned in the policy.

Let us again look to the terms of the policy itself. "With permission to navigate" [printed] "the Ohio and Mississippi rivers, below Cairo, Illinois. Coal oil clause waived" [written]. Then follows, in a printed clause, in the same class with the coal oil clause, the following : "*Warranted*, by the assured, . . . that said vessel shall be run and navigated upon the aforesaid privileged waters, as is usual for boats of her class in the usual prosecution of business." This is a stipulation that the vessel shall navigate the privileged waters, as well as navigate them in the usual way. And it then further enumerates the cases in which the policy shall be suspended until the causes for suspension are removed, to wit: "while said vessel shall be unseaworthy, or condemned as unseaworthy, except while proceeding to a port for repairs and during the time for such repairs."

Nothing is said about suspending the liability while the boat may be navigating other waters.

We have no difficulty in construing this contract of insurance to mean, and we think such would be the construction put upon it by ordinary business men, that the boat was insured to run in a particular specified field of trade, and upon that controlling view the one party agreed to pay the rate of premium, and the other to assume the risk in consideration thereof. A privilege reserved to the insured to run his boat on White river, whenever he chose to do so, at his own risk, would have changed the entire character of the contract. This case, we think, is clearly distinguishable from the case of *Palmer* v. *Warren Insurance Co.*, 1 Story C. C. 360. There the brig "Spy"

was insured for one year, from the 1st day of May, 1839, excluding, "during the term, all ports and places in Mexico and Texas, and also the West Indies, from July 15 to October 15." The vessel visited the port of St. Jago de Cuba within the excluded period, but was not lost till December, after the expiration of such period, on her return. Justice Story held that the policy was susceptible of one of three constructions, two of which would prevent a recovery for the loss. The third construction would permit the vessel to go anywhere during the year, but if injured at any of the excepted ports the insurer should not be liable; and, under the rules of construction, he was required to adopt that one which was most favorable to the insured.

The case of *Yeaton* v. *Fry*, 5 Cranch, 335, is a similar case to the one reported in 1 Story. The insurance was made against all risks, "blockaded ports and Hispaniola excepted." The vessel sailed to a blockaded port not knowing it to be blockaded, was there turned back, and afterward was lost. Chief Justice Marshall held that the clause was not a warranty, but a mere exception from the risks of the policy.

*Greenleaf* v. *Carter*, 37 Mo. 25, is also cited. The St. Louis circuit court, in that case, decided in favor of the insurer. It was appealed to the Supreme Court, where the judgment below was reversed, but two judges sitting. The clause of the policy construed was as follows: " With permission to navigate the Mississippi and Ohio rivers and their tributaries, usually navigated by boats of her class, the Missouri, Arkansas, White, Red, and Yazoo rivers excepted:" that is, *without* permission to navigate the excepted rivers—*prohibiting* such navigation.

We think the Supreme Court was in error, and that the St. Louis court, which it reversed, decided the cause correctly. The Supreme Court relied on the cases in 1 Story and 5 Cranch to sustain its decision, the terms of the policies in which cases are very different from those passed upon by that court. But, if this Missouri decision be good law, the recently decided and well-considered case of *Odi-*

*borne* v. *New England Mutual Marine Insurance Co.*, 101 Mass. 551, is not. The language of the policy, in this case, was: "Prohibited from the river and gulf of St. Lawrence, Northumberland Straits, or Cape Breton, and Black Sea, between October 1 and May 1." During this time the vessel used a port in Cape Breton and returned in safety to New York. She then sailed again for Cape Breton, and was blown out into the middle of the Atlantic and lost by the perils insured against. This clause was held to be a warranty, and the insured was unable to recover for the loss.

In the case at bar, the policy expressly *warrants*, "that the aforesaid vessel shall be run and navigated upon the aforesaid privileged waters;" and in the same connection is enumerated the things which shall temporarily suspend the risk of the insurer, to wit: "while the vessel should be unseaworthy, or condemned as unseaworthy, except while going to port for repairs and during such repairs." Running one or more times as a White river packet is not mentioned as a ground of suspension. The hardship of the case will disappear when it is borne in mind that it would have been easy for the owner of the boat, Michael Pyne, a resident and merchant in Memphis, Tenn., as his deposition shows, to telegraph to the company, at Cincinnati, for permission to make the White river trip, at his own risk, the boat having started on that voyage, from Memphis, with his knowledge.

As this is the only question the record presents for our decision, the plaintiff's exceptions to evidence and the rulings of the court, at the former trials, relating to another distinct branch of the case before passed upon by this court, it only remains for us to hold, as we do, that the judgment rendered at Special Term be affirmed.