DANIEL MᶜKINNEY & others *vs.* ARCHIBALD WILSON.

Suffolk. November 16, 1881. — June 28, 1882.

To maintain an action for breach of a contract to pay for certain goods purchased by the plaintiff for the defendant, if the goods are sent to a third person, the plaintiff must show either that such person was the agent of the defendant to receive the goods, or that some delivery or offer to deliver was made to the defendant by such person or by some one in behalf of the plaintiff.

In an action by A. against B., to recover the price of certain goods bought by A. on B.'s account and at his request, it appeared that A. sent the goods to a third person instead of to B. *Held*, that B. was entitled to put in evidence a letter to this third person from one with whom A. testified that he left the bill of lading of the goods to send to such third person, and who took full charge of the matter.

In an action pending in Suffolk county in this Commonwealth, a commission was issued to take a deposition in a foreign country. The certificate of the magistrate annexed to the deposition was headed " State of Massachusetts, Suffolk ss." *Held*, on the issue whether the deposition was taken in the foreign country or in Suffolk county, that it was competent for the judge before whom the case was tried to find that it was taken in the foreign country from

evidence that the envelope in which the deposition was received bore the post-mark and postage-stamp of such foreign country.

Under the Gen. Sts. c. 131, § 31, the Superior Court has power to make a rule, that, when a deposition is taken and certified by any person purporting to be an officer authorized by the commission to take the deposition, "if it shall be objected that the person so taking and certifying the same was not such officer, the burden of proof shall be on the party so objecting."

CONTRACT in two counts, with a count in tort. The first count alleged that the plaintiffs, at the defendant's request, purchased for him ten horses and delivered them to him at Glasgow, but the defendant refused to pay the plaintiffs the amount of the prices paid by them for the horses, with charges and commissions, as he had promised. The second count was on an account annexed. The third count was in tort for the conversion of the horses. Trial in the Superior Court, before *Putnam*, J., who allowed a bill of exceptions, in substance as follows:

The plaintiffs are copartners doing business in Boston, and the defendant is a resident of Glasgow, Scotland. The plaintiffs offered evidence tending to show that on June 5, 1880, they received from the defendant, at Glasgow, a telegram, signed " Wilson, 130 London Street," directing them to send ten horses at once; that the plaintiffs immediately began purchasing horses for the defendant, and on June 18 they had ten horses ready to ship to the defendant at Glasgow; that on that day Bernard McKinney, one of the plaintiffs, went to the National Bank of Brighton, and told one Kingsley, the president, that he wished to draw a draft on the defendant for the price which he had paid for the horses; that Kingsley asked him if he had authority so to do, and he showed Kingsley the defendant's telegram; that Kingsley then asked him if the defendant kept at 130 London Street; that he told Kingsley that he did not know; that he went away, soon returned, and informed Kingsley that one Alexander McKinley kept a stable at 130 London Street, and that his firm had had dealings with him; that Kingsley then advised him to ship and bill the horses to McKinley, and to draw on him; that Kingsley thereupon made out a bill of the horses, which began with the words, " Alex. McKinley bought of D. McKinney & Sons," and amounted with charges and commissions to the sum of $2080; that the plaintiffs assigned and

delivered this bill to the National Bank of Brighton; that Kingsley drew a draft on McKinley for $2080, payable to the order of the bank; that the plaintiff Bernard then went with Kingsley and obtained a bill of lading for the horses from a steamship company, in which the plaintiffs were named as the consignors and the National Bank of Brighton as the consignee; that this bill of lading was indorsed by the bank to " Alexander McKinley, or order, 130 London Street, Glasgow, for our account," and was enclosed with the bill in the following letter, addressed to McKinley, and signed by the president of the bank: " Enclosed find a bill for ten horses bought by D. McKinney & Sons for your account, the same being assigned over to this bank. We also inclose to you bill of lading of the same shipped on steamer Lucerne for Glasgow, by D. McKinney & Sons to the order of this bank, and by the bank indorsed over to you for our account. You will please deposit the amount of the bill, $2080, with Messrs. Blake Bros. & Co., bankers, of London, to our credit, to be cabled and paid to us here in settlement of the account. You will also have £8 per head freight to pay there. Should there be any loss, you will forward the proofs of loss to us here, and we will collect payment here for your account." The plaintiffs objected to the admission of this letter, on the ground that it was not authorized by the plaintiffs; but the judge admitted it, and the plaintiffs excepted.

McKinney testified that he left the bill of the horses and the bill of lading with Kingsley to send to McKinley; that he said he would send them; and that he took full charge of the matter; that he never notified the defendant that he had purchased the horses, or that he had shipped them to Glasgow, and that he never requested McKinley or Kingsley so to do; and that he employed one McIlvain to take charge of the horses to Glasgow.

McIlvain, who, at the plaintiffs' request, went to Glasgow with and took charge of the horses, testified, that, on the night the steamer arrived in the Clyde, he went to McKinley's house and told his servant to notify McKinley that he had some horses which had been shipped to him for the defendant; that on the following morning the defendant came to the wharf with some men; that the witness pointed out the horses to the defendant;

that the latter left him, saying he wanted to see the captain; that he soon returned and told the witness he had paid the freight on the horses; that he superintended the removal of the horses to the wharf and led some of the horses away from the wharf, while the other men, at the same time, led the others, and that he told him he would send a cab for the balance of the grain and the blankets ; that one of the plaintiffs, two or three days after the arrival of the horses, came to Glasgow; and that, in a conversation between him and the defendant, the plaintiff asked the defendant if he had got his horses, and the defendant replied, " Yes."

Bernard McKinney, one of the plaintiffs, testified that the bank had received from McKinley, as the proceeds of the sale of the horses, a certain sum, leaving the balance claimed in this action.

The defendant testified that he wrote the telegram and letter to the plaintiffs on the same day in Glasgow; that he resided two or three miles out of the city, and that he added " 130 London Street," in order that any reply sent by the plaintiffs might be sent there, and save the expense of forwarding it to his house; that he never received any information from any source that the horses had been forwarded or shipped on his account, or that any draft had been drawn on account of any horses purchased or shipped on his account; that he assisted in removing the horses from the ship at the request of McKinley, whose foreman was sick; that the horses were taken to McKinley's place, and that a few days after one of the plaintiffs came to Glasgow, took charge of the horses, and sold them to McKinley at an agreed price; that neither the plaintiffs nor McKinley ever offered the horses to him at Glasgow, or notified him that they had been shipped on his account; and that he was never asked to pay for them until he came to this country in the following August, or ever asked if he had received them.

The defendant offered in evidence the deposition of McKinley. The commission was directed " to any commissioner appointed by the Governor of the Commonwealth of Massachusetts, or to any justice of the peace, notary public, or other officer legally empowered to take depositions or affidavits in Glasgow, Scotland." The certificate annexed to the deposition was headed,

"State of Massachusetts, Suffolk ss.," and was signed, "D. D. Balfour, Sheriff Substitute of the County of Lanark, an officer legally empowered to take depositions." The plaintiffs objected to the competency of the deposition, on the ground that it was not duly authenticated and taken by a competent officer, and on the ground that it was not taken in Glasgow, Scotland, as the commission directed. The judge sent for the envelope in which the commission came, from which it appeared that it was addressed to "Jos. A. Willard, Esq., Clerk of Superior Court, Boston, Mass., U. S."; that it was postmarked "Glasgow, Feb. 19, 1881," and had on it an English postage-stamp. On examination of this envelope and the other papers, the judge, being satisfied that the deposition was in fact taken in Glasgow, admitted it; and the plaintiffs excepted. The plaintiffs further contended that the envelope was not evidence to which the judge had any right to refer.

McKinley testified in the deposition that he received the horses, with the invoice, the bill of lading and the letter annexed, and paid the freight thereon; that, upon being notified that the horses had arrived for him, his foreman being sick, he requested the defendant to superintend their unloading, as he was familiar with that work; that the horses were brought directly to his place from the steamship; that he did not know that they were intended for the defendant; that he never notified the defendant that the horses were for him, and never offered or tendered them to him, or requested him to take them or pay any draft on their account; that, a few days after the horses arrived, one of the plaintiffs came to Glasgow, and he asked him if the horses were intended for the defendant; that McKinney said the defendant had nothing whatever to do with them; and that the horses were under his custody and control until about the 5th or 6th of July, when he purchased them of McKinney at an agreed price, and sent the proceeds to the Brighton Bank, as directed in the letter.

The plaintiffs requested the judge to instruct the jury as follows: "1. No specific tender was necessary; if, in any form or way, the defendant had reason to know that these horses had arrived, and were for him, and that he could have had them, it was enough. 2. The transaction at the bank, as explained by

the plaintiffs, if believed by the jury, is no bar to the maintaining of this action by the plaintiffs against the defendant, and no notice from the bank to the defendant was legally essential. 3. No assent of the bank to a tender to the defendant was essential, provided the jury are satisfied the bank was willing the defendant should have and receive the horses under the order of McKinney."

The judge declined to give these instructions, and instructed the jury " that, in order to entitle the plaintiffs to recover, they must show that the horses were purchased and shipped to the defendant, or shipped in such a manner as to give him the possession or control, or the right to the possession or control, on their arrival at Glasgow, on paying the draft; that the plaintiffs, having shipped the horses in the name and under the control of the bank, were bound to show that they or their agents offered or tendered them to the defendant at Glasgow; that the bill of lading taken by the bank, and the invoice assigned and delivered to the bank by the plaintiffs, vested the property in the horses in the bank, and the indorsement of the bill of lading to McKinley gave him control of the property in Glasgow; that the jury must be satisfied that the property was afterwards tendered or offered to the defendant by McKinley, or some one authorized by the plaintiffs; that if the defendant never had any notice that the horses had been purchased or shipped for. him, or on his account, and after their arrival they were not offered to him by McKinley, or the plaintiffs, or their agent, upon the payment of the costs and charges, then the plaintiffs could not recover; that a mere willingness on the part of the bank, or their agent McKinley, that the defendant should have the horses, was not sufficient to make the defendant liable; that no specific tender was necessary; that if there was an offer to deliver by McKinley on payment of the draft, it was sufficient; or if, in any way, the horses came into the possession or under the control of defendant, with the understanding that they were for him, it was sufficient."

The jury returned a verdict for the defendant; and the plaintiffs alleged exceptions.

*G. W. Searle & D. H. Lannan*, for the plaintiffs.
*N. Morse & H. G. Allen*, for the defendant.

FIELD, J. The plaintiffs declare in tort as well as in contract, but the exceptions relate only to the two counts in contract. Under these counts, the plaintiffs must show a delivery of, or an offer to deliver, the horses to the defendant on payment of the sum of money agreed to be paid. The horses were not sent to the defendant, but to one McKinley. The plaintiffs must therefore show either that McKinley was the agent of the defendant to receive for him the horses, or that some delivery or offer to deliver was made to the defendant by McKinley or some one else in behalf of the plaintiffs.

The instructions given were correct, applicable to the case and sufficient, and the instructions asked for, so far as they differed from those given, were rightly refused.

The letter sent McKinley by the president of the bank, enclosing the bill of lading of the horses, was properly admitted. It was a part of the transaction, and tended to show under what claim or by what right McKinley received the horses, and whether he had any knowledge that they had been sent him for the defendant; and there was evidence that sending such a letter was within the authority given by the plaintiffs to the president of the bank.

The only remaining exceptions relate to the admission in evidence of the deposition of McKinley. The preliminary fact, that the deposition was taken in Glasgow, and not in Suffolk county in Massachusetts, was within the authority of the court to find, and was found on competent evidence. We think that this deposition was within the sixth rule of the Superior Court, which was made pursuant to the Gen. Sts. *c.* 131, §§ 31, 34; *

---

* The Gen. Sts. *c.* 131, § 31, provide that "the courts may from time to time make proper and convenient rules as to the time and manner of opening, filing and safe keeping of depositions, and other regulations concerning the taking and using thereof, which are not inconsistent with the provisions of law."

Section 34 provides that "the deposition of a witness without this State may be taken under a commission issued to one or more competent persons in any other State or country, by the court in which the cause is pending; or it may be taken before a commissioner appointed by the Governor for that purpose in any part of the United States or in any foreign country; and in either case the deposition may be used in the same manner and

and that the burden of proving that the officer was not legally empowered to take depositions was on the party objecting; and that the deposition was rightly admitted.   See *Adams* v. *Graves*, 18 Pick. 355.                                             *Exceptions overruled.*

---

subject to the same conditions and objections as if it had been taken in
this State."

The sixth rule of the Superior Court provides that the commission to take
the deposition of a witness without the State "shall be directed to any com-
missioner appointed by the Governor of this State to take depositions in any
other of the United States, or to any justice of the peace, notary public, or
other officer, legally empowered to take depositions or affidavits in the State
or country where the deposition is to be taken, unless the parties shall agree
upon the commissioners;" and that "when a deposition shall be taken and
certified by any person, as a justice of the peace, or other officer as aforesaid,
by force of such commission, if it shall be objected that the person so taking
and certifying the same was not such officer, the burden of proof shall be on
the party so objecting."